DARLING & COMPANY, Petitioner, *v.* THE POLLUTION CONTROL BOARD *et al.*, Respondents.

(No. 60286;

First District (4th Division)—April 23, 1975.

Joseph LaRocco, of Chicago (William E. Anderle and John J. O'Neil, Jr., of counsel), for petitioner.

William J. Scott, Attorney General, of Chicago (James K. Jenks, II, Russell R. Eggert, and Marvin J. Medintz, Assistant Attorneys General, of counsel), for respondents.

Mr. JUSTICE BURMAN delivered the opinion of the court:

Darling and Company, an Illinois corporation (hereinafter Darling), filed a petition requesting review of an order of the Illinois Pollution Control Board (hereinafter Board) finding Darling in violation of the Illinois Environmental Protection Act (Ill. Rev. Stat. 1973, ch. 111½, par. 1001 *et seq.*) (hereinafter Act) by creating an odor nuisance at two of its Chicago factories. The petition for review is properly before us pursuant to section 41 of the Environmental Protection Act (Ill. Rev. Stat. 1973, ch. 111½, par. 1041) and is in accordance with Supreme Court Rule 335 (Ill. Rev. Stat. 1973, ch. 110A, par. 335).

The proceedings below commenced when, on November 3, 1971, the Illinois Environmental Protection Agency (hereinafter E.P.A. or Agency) filed a complaint with the Board charging *inter alia* that Darling was operating its factory located at 4201 South Ashland Avenue in Chicago in such a manner as to cause or allow the emission of certain "odors" into the environment so as to cause air pollution either alone or in combination with contaminants from other sources, in violation of section 9(a) of the Environmental Protection Act (Ill. Rev. Stat. 1973, ch. 111½, par.

1009(a)). In response to this complaint, on February 23, 1972, Darling filed an application seeking a variance in regard to its operations at the 42nd Street plant in view of its plans to construct a new facility to replace the old one and abate any objectionable odor emissions. An additional complaint was subsequently filed by the Agency against Darling charging essentially the same violations as in the original complaint with respect to another of Darling's factories, located at 4550 South Racine Avenue, in Chicago.

The proceedings were consolidated by the Board for hearing, and extensive hearings were held by the Board on 10 different dates from July 26, 1972, to December 5, 1973. On March 14, 1974, the Board entered a written opinion and order. In that opinion and order, the Board found that odor emissions from both of the Darling plants in question violated the Environmental Protection Act, and a $5000 fine was imposed for those violations. The Board further ordered that Darling cease and desist emitting nuisance odors from its 45th Street facility within 120 days from the order. Darling's request for a variance with regard to the 42nd Street facility was granted, however, until January 31, 1975, and that portion of the Board's decision is not before us in this appeal.

Darling is engaged in the business of "inedible rendering"—that is, it processes inedible animal scrap waste into various commercially usable products. It has operated in what was once commonly known as the Stockyards Area of Chicago for almost 100 years. The plant located at 42nd Street and Ashland Avenue has been in operation since 1882 and is used for the production of bone glue. We are informed that this is the only bone-glue plant presently operating in the State of Illinois. The other rendering facility located near 45th Street and Racine Avenue was built in 1949, and is used to produce a variety of products from animal scrap waste, viz.: (a) tallow, which is used for soap and other items; (b) meat meal, which is used as a protein ingredient in animal and pet food; (c) bone meal, which is a mineral feed supplement for poultry and dairy animals; (d;) fatty acids and glycerine, used in such things as cosmetics, automobile tires, plastics and organic chemicals.

The crux of Darling's three-part argument on appeal is that the evidence at the hearings failed to establish that Darling did not comply with the objective standards set forth in Rule 802 of the Illinois Pollution Control Board rules and regulations contained in chapter 2, part VIII, Odors, entitled "Inedible Rendering Process" and dealing with "objectionable odor nuisance" in that type of business operation; and that therefore the Board's findings are in direct contravention of the Board's own standards and amount to both a violation of the Environmental Protection Act and of Darling's right to due process of law. It is

asserted that in adopting the standards contained in Rule 802, the Board is precluded from finding that the emission of odors by an inedible-rendering plant below the levels set out in Rule 802 amounts to a violation of the Act. The Board is further claimed to have improperly ignored its own objective scientific standards contained in the rule and to have instead relied almost exclusively on the subjective testimony of lay witnesses in finding Darling in violation of section 9(a) of the Act—testimony which is deemed insufficient as a matter of law. Darling finally contends that it was denied due process of law and that the Board violated the Act because the Board failed to consider the objective scientific evidence relating to odor emissions that was presented by Darling.

The testimony presented at the hearings included first that of a number of private citizens who lived and/or worked in the Stockyards Area, and some Agency employees, regarding the severity of the odor which they personally detected and which they believed was emitted from the Darling plants. Other Agency employees testified that they conducted "scentometer" tests [1] near the Darling plants, and the results were presented in one of the Agency's exhibits. Henry Friedrich, vice-president of an independent environmental engineering consulting firm, testified on behalf of Darling regarding his evaluation of odor emissions at the 42nd Street Darling facility by means of an "odor panel" technique, including the use of "stack tests." [2] He questioned the results of the scentometer tests conducted by the Agency for various reasons and identified 16 or more other possible sources of odor in the vicinity of the Darling plants which may have contributed to the scentometer results and to the subjective opinions of the witnesses.

Darling throughout its argument on appeal places great emphasis on

---

[1] The "scentometer," as described at the hearings by Frederick Smith of the E.P.A., is a small rectangular box made out of plastic containing three air chambers. The two outer chambers contain a bed of charcoal. When air is introduced into these chambers through two small holes, it passes through the charcoal, thereby being cleansed of any odor, and then passes into the central or mixing chamber. Air containing the odor is then introduced into the mixing chamber, first through the smallest of four holes leading into the chamber. The person making the odor determination then sniffs through a nasal port and determines if he can detect any odor. If not, the next largest hole leading to the mixing chamber is opened, and so on until an odor can be detected. The "Dilution to Threshold Ratio" measure is the amount of pure air required to dilute odorous air.

[2] Briefly, the "odor panel" technique, as described by Friedrich, first involves the taking of air samples with uncontaminated bulbs at various locations in the subject plant. The air samples are then released in odor-free enclosures occupied by carefully chosen "panelists." The panelists are pre-tested to determine their odor sensibility, and only those with the most consistent and average sensibility are chosen. The odor released is measured in terms of odor units per cubic foot. "Stack tests" determine the amount of odor at the exhaust emission points in the facility being tested.

the testimony of Mr. Friedrich, and on Rule 802, which provides as follows:

*"Inedible Rendering Process.*

(a) The provisions of this regulation shall not apply to any device, machine, equipment, or other contrivance used exclusively for the processing of food for human consumption and to food service establishments.

(b) No person shall operate or use any device, machine, equipment, or other contrivance for the inedible rendering of animal or marine matter unless all gases, vapors and gas entrained effluents from these processes shall be controlled in such manner as to effectively abate any objectionable odor nuisance. *In the event that the rendering processes of more than one company are contributing to the objectionable odor nuisance, abatement shall be deemed effective when the odor concentration from each process is not more than 120 odor units/cubic foot as determined by Mills\* adaptation of ASTM D-1391-57.* [Emphasis added.]

(c) An objectionable odor nuisance exists when a trained state inspector, upon the receipt of a complaint from one resident or property owner in the area affected shall determine that these odors cause a nuisance as outlined in Rule 802(d).

(d) Objectionable Odor Nuisance Determination. An objectionable odor nuisance exists:

\*    \*    \*

On or adjacent to industrial premises when odor is detectable in the ambient air after it is diluted with twenty-four volumes of odor-free air as measured by the Scentometer;

\*    \*    \*

When concurrent determinations made by three trained inspectors as outlined above in any given one hour period and at intervals of not less than fifteen minutes result in two positive determinations in each series of three determinations; and

Provided that any quantitative odor level measurements taken to arrive at a determination that an objectionable odor nuisance exists shall be at or beyond the property line or at or near places where people live or work.

Darling focuses on the italicized portion of part (b) of Rule 802 and

---

\* As described in paper entitled "Quantitative Odor Measurement" by John L. Mills, et al., presented at the 56th Annual Meeting of APCA, Sheraton-Cadillac Hotel, June 9-13, 1973, Detroit, Michigan."

argues that under the facts here the E.P.A. was required to make stack emission tests and determine that the odor concentration being emitted from Darling's plants was in excess of 120 odor units per cubic foot as determined by Mills adaptation of ASTM D-1391-57, and that this was never done. Further it is noted that Mr. Friedrich testified that he conducted ASTM tests at the 42nd and Ashland plant in accordance with the requirements of Rule 802(b), and the results indicated exhaust stack emissions of 3.8 to 40 odor units per cubic foot, all well below the 120 odor units per cubic foot limitation set out in part (b) of the Rule. Although parts (c) and (d) of Rule 802 are acknowledged by Darling as setting forth a procedure for determining objectionable odor levels in an inedible-rendering facility in terms of scentometer readings, and the scentometer readings offered by the E.P.A. indicate that Darling exceeded those levels, the standards in part (d) are deemed preempted by those in part (b) under circumstances where, as stated in part (b), "the rendering processes of more than one company are contributing to the objectionable odor nuisance." Since Mr. Friedrich testified as to numerous other sources of odor in the vicinity of the Darling plants, including other rendering facilities, 802(b) is asserted to have applicability. Furthermore, Darling points out that the Board itself severely discounted the scentometer results in its written opinion by stating:

> "The results [of the scentometer tests] were effectively rebutted by the testimony of Henry Friedrich * * *. We will not go into great details of Mr. Friedrich's testimony, but just to summarize it, he questioned the fact that there was not any determination as to the sensitivity of the test personnel as to odors, there was not proper maintenance of the device, that there was no determination of background odor to determine whether the odor being measured was that of Darling and Company * * *. The scentometer testimony thusly has been considered for what it is worth. The Board does not discount the usefulness of such detection devices, but suggests that proper controls be taken to insure the reliability of the test results."

Darling argues that the sole basis for the Board's finding was necessarily, then, the testimony of the lay witnesses, which "is insufficient, as a matter of law, to sustain the alleged violations * * *, in view of the objective odor standards adopted by the Board applicable to the inedible rendering process * * *," contained in the Board rules and regulations.

The Agency responds to this argument principally by indicating that Darling was not charged with a violation of a Board regulation establish-

ing specific odor-emission limits, but instead was charged with specific violations of section 9(a) of the Environmental Protection Act, which provides as follows:

"No person shall:

(a) Cause or threaten or allow the discharge or emission of any contaminant into the environment in any State so as to cause or tend to cause air pollution in Illinois, either alone or in combination with contaminants from other sources, or so as to violate regulations or standards adopted by the Board under this Act;"

(Emphasis added.) (Ill. Rev. Stat. 1973, ch. 111½, par. 1009(a).) The Agency argues that the language of this provision clearly indicates that an action may be pursued on either of two alternative bases—the emission of any "contaminant" so as to cause "air pollution" (as those terms are further defined in section 3(b) and (d) of the Act (Ill. Rev. Stat. 1973, ch. 111½, par. 1003(b), (d))), or the violation of a Board regulation or standard. The Agency therefore asserts that compliance with the provisions of the Board rule involved here does not exonerate Darling from all liability under the Act.

In support of this interpretation, the Agency further points to section 49(e) of the Act, which provides:

"Compliance with the rules and regulations promulgated by the Board under this Act shall constitute a prima facie defense to any action, legal, equitable, or criminal, or an administrative proceeding for a violation of this Act, brought by any person."

(Ill. Rev. Stat. 1973, ch. 111½, par. 1049(e).) The language of this section is compelling, and persuades us that the legislature did not intend, as Darling implies, that compliance with a regulation is an absolute defense to any suit brought under the Act. If the legislature had intended that the violation of a rule or regulation should become, upon its promulgation by the Board, the sole enforcement device, then the language of section 49(e), providing that compliance with a regulation is a prima facie defense to any action under the Act, would be wholly superfluous. It further seems reasonable that if the legislature intended that the promulgation of a regulation should preclude the applicability of other statutory standards, it would have so provided by clear language in the Act. A "prima facie" defense is sufficient at law unless and until rebutted by other evidence. Here other evidence at the hearings, in the Board's view, established a violation of the Act by Darling. We therefore find no reason to upset the Board's order.

Darling relies heavily on the Illinois Appellate Court decision in *Mystik Tape v. Pollution Control Board*, 16 Ill.App.3d 778, 306 N.E.2d

574, to support its argument that the existence of Rule 802 is a bar to an action for a violation under section 9(a) of the Act. In *Mystik* no rules or regulations setting standards applicable to the alleged offense existed, and the appellate court considered section 5(b) of the Act, which provides:

> "The Board shall determine, define and implement the environmental control standards applicable in the State of Illinois and may adopt rules and regulations in accordance with Title VII of this Act." (Ill. Rev. Stat. 1973, ch. 111½, par. 1005(b).)

That section was construed by the appellate court to *require* the Board to set environmental control "standards," other than those inherent in the Act itself, but the court found that these standards need not be developed only through the use of regulations. They might also be developed, in the court's view, through a system parallel to the common law method of case-by-case decisions, with Board opinions serving as precedent in subsequent proceedings involving similar violations under the Act. Since no standards applicable to the case had been established by the Board through the use of rules and regulations, the Board opinion was held to require a delineation of such standards. The court found the opinion of the Board in that case deficient in that respect, and in that it failed to disclose a full consideration of "all the facts and circumstances bearing upon the reasonableness of the emissions," as provided in section 33(c) (Ill. Rev. Stat. 1973, ch. 111½, par. 1033(c)) of the Act, and the court set aside the Board's order finding *Mystik* in violation of the Act. Although the precise issues raised in *Mystik* are not before us in this appeal, some of the language in that opinion is urged as lending support to Darling's position. (See also *W. F. Hall Printing Co. v. Environmental Protection Agency*, 16 Ill.App.3d 864, 306 N.E.2d 595.)

■■ While the instant case was pending on appeal, the Illinois Supreme Court, which had granted a petition for leave to appeal in the *Mystik* case, rendered a decision in *Mystik*. (*Mystik Tape v. Pollution Control Board*, 60 Ill.2d 330.) The supreme court affirmed the appellate court in part, by agreeing that apparently the Board had improperly failed to require that the emission of contaminants must *unreasonably* interfere with the enjoyment of life or property (as provided in section 33(c)) for there to be a violation of section 9(a). It expressly rejected, however, other of the appellate court's reasoning, and held that the Act does not require that a specific standard adopted by the Board be found to have been violated for there to be a determination either of air pollution or of prohibited conduct. It stated:

> "Section 9(a) of the Act specifies some of the conduct pro-

hibited. It bars one from discharging any contaminant into the environment 'so as to cause or tend to cause air pollution * * * or so as to violate regulations or standards adopted by the Board * * *.' This section clearly contemplates that one may be in violation of the Act *either* if he causes air pollution *or* if he violates a regulation or standard. * * *" 60 Ill.2d 330, 335.

"Thus, we find the specific standards referred to in section 5(b) are not necessary prerequisites to finding a violation of the statutory provisions of the Act. We agree with Mystik and the appellate court as to the desirability of the adoption of specific administrative standards. We do not, however, agree that such standards are necessary to a charge, or finding, of a violation of the Act." 60 Ill.2d 330, 336.

In making the above determination in *Mystik*, the supreme court mentions two of its earlier decisions, which also have applicability to and support our conclusion in the instant case. In *City of Monmouth v. Pollution Control Board*, 57 Ill.2d 482, 313 N.E.2d 161, the city contended that section 9 of the Act was unconstitutional for the reason that it did not contain sufficient standards for determining what constitutes air pollution. As in *Mystik*, the Board had not adopted regulations and standards as contemplated by that section. The court found it "apparent that under section 9(a) a complaint may be based on the violation of either the express statutory provision or the 'regulations or standards adopted by the Board * * *.'" (57 Ill.2d 482, 486, 313 N.E.2d 161, 163.) It went on to hold that section 9(a), when read in conjunction with sections 3(b), 3(d) and 33(c) of the Act,[3] contains sufficient standards to assure its constitutionality in that regard, and since the complaint charged a violation of the express provisions of the Act and not of a standard or regulation, the city's contention was rejected. Thus the finding of a violation based on section 9(a) was justified, at least as in *Mystik* where no regulations had been promulgated. In the later *Incinerator, Inc. v. Pollution Control Board*, 59 Ill.2d 290, 319 N.E.2d 794, an action was commenced alleging violations both of section 9(a) of the Act, in regard to air pollution, and of particulate-emission standards and smoke-emission standards contained in Board rules and regulations. The Illinois Supreme Court had no difficulty in upholding the Board's finding that Incinerator was in violation of both section 9(a) *and* the rules *and* regulations. It is apparent the violations were treated distinctly, since the court noted that the Board imposed a $20,000 fine for the section 9(a) violation, but no monetary penalty for either of the Board rule violations.

---

[3] Ill. Rev. Stat. 1973, ch. 111½, pars. 1003(b), 1003(d), and 1033(c).

Finally, we note that other Illinois courts at the appellate level are apparently in agreement with our construction of the Act, and recently have specifically held that, in accordance with the language of section 49(e), compliance with applicable regulations does not automatically absolve one from liability under section 9 of the Act, but only constitutes a rebuttable prima facie defense of such liability. See *People v. Gilbert and Bennett Manufacturing Co.*, 25 Ill.App.3d 168; *Lloyd A. Fry Roofing Co. v. Pollution Control Board*, 20 Ill.App.3d 301, 310; 314 N.E.2d 350, 357.

In its opinion and order, the Board pointed out that this case had a long and confusing history. Hearings were held on 10 different dates. Members of the public were present and some of them gave testimony. A total of 11 people who lived and/or worked in the area of the Darling plants testified on behalf of the Agency, each describing the odor (some through the use of rather graphic simile, *e.g.*, "It [smells] like the whole Russian Army barefoot") believed to be emanating from the Darling plants and many describing its effect on them (*e.g.*, nauseating, dizzying). Other testimony offered by the Agency included that of four E.P.A. engineers, and an E.P.A. emission source sampler who supervised the scentometer tests. These witnesses testified as to the odor they detected emanating from the Darling plants based on visits they made to the Stockyards area or on tours of the Darling plants. All of the Agency witnesses were cross-examined at length regarding their observations, perceptions, or procedures. The scentometer results were summarized in Agency Exhibit No. 9, although the Board, as noted above, found them to be of limited usefulness in light of the testimony of Henry Friedrich, an independent environmental engineering consultant who appeared on behalf of Darling. The Board further considered and evaluated Mr. Fredrich's testimony as to the odor sample tests of the 42nd Street Darling plant which his firm conducted and as to possible odor-emission sources in the area other than the Darling plants.

After reviewing and commenting on the evidence at length, the Board found "ample testimony to show that Darling and Company at both its 42nd St. and 45th St. plants violated Section 9(a) of the Act" by allowing, in the language of the Act, "the discharge or emission of any contaminant into the environment in any state so as to cause or tend to cause air pollution in Illinois, either alone *or in combination with contaminants from other sources* * * *." (Emphasis supplied by Board.) The Board further indicated that Section 3(b) of the Act defines air pollution as "the presence in the atmosphere of one or more contaminants in sufficient quantities and of such characteristics and duration as to be injurious to human, plant or animal life, *to health,* or to property, or to

*unreasonably interfere with the enjoyment of life or property*   \*   \*   \*." (Emphasis supplied by Board.) The Board opinion then continues:

> "The Board finds that Darling and Company, in combination with other point sources not determined, did emit into the atmosphere of the State of Illinois, contaminants (in the form of odors), which in fact unreasonably interfered with health and the use and enjoyment of life and property. The citizen testimony, though rebutted as to Darling's being the only source of odor emission, was such as to let us know that there is a tremendous odor problem in the area and that Darling and Company contributes to it. The testimony of Mrs. Duvick and the Agency personnel that the odor in Darling's plant is the same as the odor in the neighborhood is sufficient to indicate Darling's contribution. The area has odors that interfere with the life of persons who both live and work in the area. As such, Darling will be required to abate these odors in a manner set out in the Order that will follow this Opinion.

> "The Board finds that there is an unreasonable interference with the quality of life for those who must reside in the area and those who must work there daily. People should not be expected to hold their breaths on buses and gag from the air   \*   \*   \*."

The Board also recognized that Darling does provide a service that is necessary for health and sanitation by disposing of the waste products for the meat industry, that this service would not be readily transferable to other sectors of the economy or to government, and that the Stockyards area is as suitable to the rendering industry as any area would be. Nevertheless, Darling was ordered to cease and desist creating an odor nuisance as defined in section 9(a) and 3(a) of the Act at both its plants. Darling was also ordered to submit a compliance plan for the 45th Street plant, "which shall include a truly effective negative pressure system and very strict housekeeping requirements to prevent material from spilling in such areas as the unloading docks to prevent odors." In another portion of the opinion, a variance plan was decided upon in regard to the 42nd Street plant. Finally Darling was ordered to pay a monetary penalty for its violations of the Act in the amount $5,000.

■■ Considering this record, we find no reason to upset the findings of the Board, which are supported by sufficient, competent evidence. (*Lloyd A. Fry Roofing Co. v. Pollution Control Board*, 20 Ill.App.3d 301, 314 N.E.2d 350.) A further cryptic argument made by Darling in its reply brief is futile and logically defective. The gist of this argument appears to be that since the Agency followed the procedure under Rule 802 to some extent by taking scentometer tests, its "testimony clearly charged Darling with a violation" of the rule, and therefore the Agency was

somehow compelled to fully and properly comply with the rule as interpreted by Darling. This proposition again ignores that Darling was alleged in the complaint and found by the Board to be in violation of section 9(a) of the Act.

■■ We finally perceive no merit to Darling's assertion that it was denied the right to due process of law. Again, Darling was not found to be in violation of the Board rule with which it asserts compliance. The complaint and findings were based on a violation of section 9(a) of the Act, which, as we have already indicated, the Illinois Supreme Court has recently upheld as constitutional in response to a contention that it did not contain sufficient standards for determining what constitutes air pollution. (*City of Monmouth v. Pollution Control Board*, 57 Ill.2d 482, 313 N.E.2d 161.) The cases cited by Darling in regard to its claimed deprivation of due process (*Brown v. Air Pollution Control Board*, 37 Ill.2d 450, 227 N.E.2d 754; *Wachta v. Pollution Control Board*, 8 Ill.App.3d 436, 289 N.E.2d 484) clearly relate to facts and circumstances wholly inapposite to those involved in the case at bar and require no detailed discussion.

For the reasons given the order of the Board is affirmed.

Affirmed.

DIERINGER, P. J., and ADESKO, J., concur.

