VILLAGE OF LOMBARD, Petitioner, *v.* POLLUTION CONTROL BOARD *et al.*, Respondents.

Second District (2nd Division)    No. 74-302

Opinion filed April 15, 1976.—Rehearing denied May 12, 1976.

DIXON, J., dissenting.

James K. Young and Ralph G. Gust, Jr., both of Lombard, for petitioner.

William J. Scott, Attorney General, of Chicago (Russell R. Eggert and Marvin I. Medintz, Assistant Attorneys General, of counsel), for respondents.

Mr. JUSTICE RECHENMACHER delivered the opinion of the court:

The Village of Lombard (Lombard) has petitioned for a review of an order entered by the Pollution Control Board (Board) on August 29, 1974.[1] That order established a countywide Wastewater Regionalization Program (Rule 1115) for Du Page County, consisting of nine regions. On September 27, 1974, the Board issued its opinion in support of that order.

On January 6, 1972, following a report on a Regional Wastewater Plan issued in July, 1969 by the Northeastern Illinois Planning Commission (NIPC)[2], the Board promulgated Rules 1101 through 1114 which provided for general public hearings to be conducted by a different hearing officer in each of the nine treatment regions recommended in that report.[3] The hearing officers were thereupon to issue their respective recommendations to the Board as a basis for eventual action by the Board. The 1969 NIPC plan had recommended that the area consisting of the municipalities of Highland Hills, York Center and Congress Knolls (referred to as "disputed area" in the Board's opinion of September, 1974) be included with Lombard (and other municipalities) in one of the regions.[4]

After the regional hearing in Region III were concluded the hearing officer for that region submitted his memorandum to the Board recommending that the disputed area be included in Region III, with Hinsdale Sanitary District (HSD) as regional authority.

It should be noted that the disputed area is in the northwest portion of Region III and is surrounded on the east, north and west sides by Region IV, and that representatives of local governments in the disputed area expressed a desire to be included in Region III. At those hearings Lombard's witnesses testified regarding Lombard's prior installation of interceptor sewers in reliance upon the inclusion of the disputed area

---

[1] The petition for review was filed within thirty-five days of the date of that order, pursuant to section 41 of the Environmental Protection Act (Ill. Rev. Stat. 1971, ch. 111½, par. 1041) and Supreme Court Rule 335 (Ill. Rev. Stat. 1973, ch. 110A, par. 335).

[2] This plan was revised by NIPC on September 9 and October 21, 1971, and finally, on January 20, 1972.

[3] Further details concerning the preamble and some of the provisions of those rules were stated by us in *Hinsdale Sanitary Dist. v. Pollution Control Board*, 30 Ill. App. 3d 860, and need not be restated here.

[4] The disputed area is generally bounded on the south by 22nd Street, on the east by Meyers Road, on the north by Roosevelt Road and on the west by Lombard's Main Street, and includes some school property west of Main Street.

within the same region which could be served by Lombard, as recommended by NIPC's 1969 Regional Wastewater Plan.

Almost six months later the Region IV hearing officer, after conclusion of hearings in that region, submitted his memorandum. It criticized what it referred to as "the piecemeal approach" of the Region III hearing officer's memorandum with respect to the disputed area because it would violate "the principle of protecting municipal integrity," in that (a) it "would result in the construction of a sewer by Region III through portions of Region IV," and (b) "it ignores the fact that the entire disputed area lies within the ultimate boundaries of the Village of Lombard and extends almost to the present center of Lombard." Thereafter, the Board, on August 29, 1974, entered the order appealed from, placing the disputed area in Region III to be served by HSD.

■■ The first issue presented by Lombard is whether the Board has power under the Environmental Protection Act (Ill. Rev. Stat. 1971, ch. 111½, par. 1001 *et seq.*) to impose by order a Wastewater Regionalization Plan on the various local governmental units and municipalities in Du Page County to be affected thereby. Before considering that issue we must first dispose of the Board's contention that the regionalization program in Du Page County was "established" by the Board's order of January 6, 1972, and that Lombard, having failed to petition for review within 35 days of that order,[5] is precluded from challenging the Board's authority to enter its order of August 29, 1974, imposing countywide wastewater regionalization.

Lombard was not "adversely affected or threatened by" the Board's 1972 order so as to require it to petition for review thereof (Ill. Rev. Stat. 1971, ch. 111½, par. 1029). Moreover, as we stated in referring to that order in *Hinsdale Sanitary Dist. v. Pollution Control Board*, 30 Ill. App. 3d 860, 862, the 1972 order was no more than "a blueprint for procedures, organization and coordination necessary to achieve the regionalization of sewerage treatment." We further stated in *Hinsdale* that Rule 1113 of that order "cannot, by its own terms, become effective until the investigatory work and recommendations required under paragraph 1108 have been completed." Rule 1108 provided for the issuance by the Board of a detailed, regional program for each of the nine regions after receipt of the recommendations from the hearing officers of each region. The regional program contemplated in that rule was not accomplished until the Board, on August 29, 1974, entered the order appealed from imposing wastewater regionalization.

The Board's opinion supporting that order quoted portions of the opinion which supported the Board's 1972 order including the following:

---

[5] As required by section 41 of the Environmental Protection Act (Ill. Rev. Stat. 1971, ch. 111½, par. 1041).

"In promulgating this regulation, the Board shifts the onus of determining the manner of regionalization back to where it belongs—the people and governmental bodies of DuPage County. * * * It is our earnest hope that the Plan presented by the parties constitutes a detailed viable solution such that the Regional Program approved by the Board need only be a stamp of approval."

■■ It should also be noted that the order appealed from itself expressly states that "this proceeding is deemed by the Board to be a final action in other respects [than proposed modification] such as right of appeal." We therefore hold that Lombard's petition for review is timely and that Lombard is not barred from challenging the underlying validity of the 1974 Regionalization Order.

Returning to Lombard's first issue, Lombard argues that the Board is without statutory power to impose regionalization upon local governmental bodies and municipalities. It points to the holding of our Supreme Court in *North Shore Sanitary Dist. v. Pollution Control Board,* 55 Ill. 2d 101, that the Board is without power under the Act to order the issuance of general obligation or revenue bonds, as distinguished from its statutory power to order abatement of pollution practices by any municipality, sanitary district or other local governmental body, and the resulting obligation of such governmental unit, in that event, expressly provided and conditioned by section 46(a) of the Act, to raise the necessary funds for those purposes by the issuance of such bonds without referendum. See Ill. Rev. Stat. 1973, ch. 111½, par. 1046(a).

■■ While the Board asserts that it has the power to order countywide regionalization it does not point to any statutory grant of such power. The Board unquestionably has the broad power to adopt regulations to restore water quality and to prevent the threat of future pollution in Illinois. However, the Act does not give the Board any power to *compel* regionalization to accomplish that purpose.

■■ Its 1972 Order was obviously intended to accomplish wastewater regionalization and co-operation by voluntary means. This had been done long since by Lombard and its neighboring municipality, Glen Ellyn, in their creation of a joint commission called the Glen Ellyn-Lombard Regional Commission which operates the Glenbard Wastewater Treatment Plant. During the course of the regional hearings diligent efforts were made by NIPC and by many of the participants to bring about the enactment of legislation to grant such power to the Board. These efforts proved unsuccessful.

■■ Our analysis of the provisions of the Act, including those relating to the Board's power to adopt rules and regulations, discloses no provisions that would authorize the Board to enter the order appealed

from imposing regionalization. It is up to the State legislature, if it deems such power necessary and advisable, to grant such power to the Board. We decline to encroach upon the prerogatives of the State legislature.[6] In the absence of a grant to the Board of power to impose wastewater regionalization on municipalities, sanitary districts, or other local, governmental bodies without their consent, the Board's order purporting to do so requires reversal.

The petitioner's second issue is that the order setting the boundaries of Region III and Region IV so as to include the disputed area in Region III is against the manifest weight of the evidence. We consider it unnecessary to address ourselves to this issue in view of our conclusion that the order appealed from must be reversed.

For the reasons stated the Board's regionalization order of August 29, 1974, is reversed.

Judgment reversed.

T. J. MORAN, P. J., concurs.

Mr. JUSTICE DIXON, dissenting:

Section 13(a) of the Environmental Protection Act (Ill. Rev. Stat. 1973, ch. 111½, par. 1013(a)), provides in part:

"The Board, pursuant to procedures prescribed in Title VII of this Act, may adopt regulations to promote the purposes and provisions of this Title. *Without limiting the generality of this authority,* such regulations may among other things prescribe [there follows a list of 9 specific areas of authority]." (Emphasis added.)

---

[6] Mr. Dumelle, a member of the Board, stated several times during the hearings in February, 1971, that the power to order regionalization "is not a power that seems to be in our Act except through the mechanics of ordering bond issues on a particular case ° ° ° ." and, as follows:

"I can't conceive that we can order a new regional government or something of that sort because then you infringe on all kinds of other acts regarding indebtedness or regarding other governments and so forth, but there may be some areas which we can be of help."

The Board in its opinion supporting the order appealed from stated:

"Ideally, legislation clarifying the administrative responsibility and financial authority for carrying out a regionalization program would be highly desirable. Such legislation has been under consideration by the General Assembly for the last three sessions, although at this writing nothing has been enacted by either House and what is proposed would require referendum which, as noted above, has been unsuccessful when previously submitted. As the Board said in June of 1971 and reiterates three years later, it cannot continue waiting for legislative assurance that such a program will be effectuated nor can it permit the unlimited suspension of a plan which all parties recognize as essential, but on which disagreement as to implementation may still exist. The regulations ultimately adopted for Du Page regionalization were in response to this factual and legal situation."

The Board thus has broad powers to regulate to accomplish the goals of the Act. To determine whether a particular regulation is within the Board's power, one must look to the "purposes and provisions" of Title III.

Section 11 (Ill. Rev. Stat. 1973, ch. 111½, par. 1011) is a general declaration of legislative findings concerning water pollution. Section 11(b) provides in part:

> "It is the purpose of this title to restore, maintain and enhance the purity of the waters of this State in order to protect health, welfare, property, and the quality of life, and to assure that no contaminants are discharged into the waters of the State, * * * without being given the degree of treatment or control necessary to prevent pollution, or without being made subject to such conditions as are required to achieve and maintain compliance with State and federal law * * *."

More specifically, section 12 of the Act (Ill. Rev. Stat. 1973, ch. 111½, par. 1012), provides in part:

> "No person shall:
>
> (a) Cause or *threaten* or allow the discharge of any contaminants into the environment in any State so as to cause or tend to cause water pollution in Illinois, either alone or in combination with matter from other sources, or so as to violate regulations or standards adopted by the Pollution Control Board under this Act." (Emphasis added.)

The Board may thus regulate to restore water quality and to prevent the threat of future water pollution in Illinois. The only remaining question is whether Du Page regionalization will advance these goals.

There can be no question but that the present system of wastewater treatment in Du Page County poses utterly unacceptable risks. The proliferation of small, uneconomic, inefficient treatment plants has created a continuous threat of areawide water pollution. This was made clear at a very early stage of the hearings by the testimony of Carl Blomgren, an engineer with the Illinois Environmental Protection Agency. Mr. Blomgren stated that the agency favored regionalization, and offered the following reasons:

> "1. Plants at larger capacities generally are staffed with more competent personnel and provide 24 hour operator coverage to insure proper operation. Lack of proper operation is, in our opinion, one of the largest single factors for the degraded water quality in our Illinois streams.
>
> 2. Laboratory control determinations generally are performed accurately only at the plants properly staffed with qualified

chemists. Control tests are required to properly operate any biological process.

3. Plants with larger capacities generally have three or more units designed for a function (such as settling or biological treatment) permitting any unit to be taken out of service for repairs with increasing the load to the other units by less than 50%. At smaller plants, generally only two units are provided for a function (to comply with the Environmental Protection Agency requirement for multiple units) which then are 100% overloaded when one unit is removed from service.

4. Plants at larger capacities are not as susceptible to plant upset due to infiltration of storm water or inadvertent slugs of industrial wastes due to the inherent dilution capabilities of the larger systems.

5. Plants at larger capacities serve larger areas and as such the daily peak flows are a smaller percentage of the design average flow resulting in better overall daily treatment.

6. Plants at larger capacities generally have lower capital costs and lower operating and maintenance costs per million gallons."

The Board expressly incorporated these views into its opinion in support of the regulations. Lombard has not disputed them.

The need for consolidation into larger plants as soon as possible is equally clear. All of the population projections offered at the hearings predicted a steady and dramatic growth in the population of Du Page County over the next 20 to 30 years. It will be necessary to expand sewage treatment facilities to meet the enormous demand created by the increased population. This expansion cannot occur overnight: the necessary capital improvements are a long term project, requiring the kind of long term planning done by the Board in the Du Page regionalization order.

The policy of regional treatment is not unique to Du Page County or even to Illinois. In the Federal Water Pollution Control Act Amendments of 1972 (P.L. 92-500), Congress expressed a similar policy in section 208 (33 U.S.C. §1288). Our General Assembly amended sections 11, 12 and 13 of the Environmental Protection Act (Ill. Rev. Stat. 1975, ch. 111½, pars. 1011, 1012 and 1013), effective September 14, 1973, to reflect the Federal act by reference. Also see *Armstrong, Chemcon, Inc. v. Pollution Control Board*, 18 Ill. App. 3d 753, 756, 757 (*leave to appeal denied*), for authority prior to 1973 amendments.

The action of the Pollution Control Board in promulgating the regulations here under review is obviously necessary to prevent the threat of water pollution in the years to come: it is a long term solution to a long term problem. The Board is expressly empowered, is indeed required, to

prevent the threat of water pollution. The regulations in question are clearly proper, and should be upheld.

Lombard relies primarily on *North Shore Sanitary Dist. v. Pollution Control Board*, 55 Ill. 2d 101, 302 N.E.2d 50 (1973), which held in part that the Board could not direct the Sanitary District to issue general obligation bonds in order to finance pollution control facilities. Blithely assuming that the Board is thus powerless to issue specific orders in *any* enforcement case, the Village goes on to say that it is also powerless to do so in a rule-making context. The argument is not only a *non sequitur*, it ignores recent case law to the contrary.

The basis of the Pollution Control Board's power to issue final orders in enforcement cases is section 33 of the Environmental Protection Act (Ill. Rev. Stat. 1973, ch. 111½, par. 1033). Section 33(a) authorizes the Board to issue and enter final orders. Section 33(b) specifically delineates the permissible scope of enforcement orders:

> "Such order may include a direction to cease and desist from violations of the Act or of the Board's rules and regulations or of any permit or term or condition thereof, and/or the imposition by the Board of civil penalties in accord with Section 42 of this Act."

There are thus explicit statutory limitations on the scope of the Board's final orders in enforcements proceedings. It should be noted, however, that these limitations do not prohibit the Board from making *any* sort of specific mandatory order. *Darling & Co. v. Pollution Control Board*, 28 Ill. App. 3d 258, 328 N.E.2d 122 (*leave to appeal denied*), was a petition for review from a Board order requiring, *inter alia*, that *Darling* submit a compliance plan "which shall include a truly effective negative pressure system and very strict housekeeping requirements to prevent material from spilling in such areas as the unloading docks to prevent odors." The order in that case was at least as specific as that in *North Shore Sanitary Dist.* Although the First District did not say so, apparently *North Shore Sanitary Dist.* is to be confined to its facts: the Board is thus powerless to direct the issuance of general obligation bonds by special districts. It may issue specific orders in other kinds of enforcement cases.

In any event, the case law defining the enforcement powers of the Board obviously should not be blindly applied to rulemaking proceedings, as Lombard would do. In raising the issue of the Board's power to make rules which impose specific mandatory duties, this case presents a question of first impression. An analysis of the rulemaking provisions of the Environmental Protection Act, and the policy underlying them, can only result in upholding the regionalization regulations.

The Board's power to promulgate regulations derives from Title VII of the Environmental Protection Act (Ill. Rev. Stat. 1973, ch. 111½, pars.

1026-1029). Sections 27 empowers the Board to adopt substantive regulations, and lists a variety of different kinds of provisions which are allowable. It goes on to require the Board to "take into account" a variety of different factors, all of which are designed to ensure that a reasonable balance among competing legitimate interests is reached in Board rules; none of these has been placed in issue by Lombard. Finally, and most significantly, section 27 provides:

> "The generality of this grant of authority shall only be limited by the specifications of particular classes of regulations elsewhere in this Act."

The Board thus has broad discretion to adopt regulations. So long as its regulations meet the procedural requirements of Title VII, and are in furtherance of the Board's power to abate air, water, land or noise pollution, they should be upheld. Nowhere in the statute is there any indication of an intention to limit this otherwise broad grant of authority to the power to merely "order certain polluters within Du Page County to abate a condition."

There are sound reasons underlying this broad grant of power to the Board. Administrative rulemaking, like legislation, is prospective in nature. To be effective, or even comprehensible, it is sometimes necessary to be very specific: the traditional "cease and desist" order is simply not always enough when policy judgments are being made. To deprive the Board of the flexibility of issuing specific regulations would be to deprive it of effective rulemaking power in many circumstances.

The present case is a good example of the kind of situation in which specific, mandatory regulations are a necessary tool. Regionalization is necessary to eliminate continued inadequate treatment of sewage which, when combined with the rapid growth of Du Page County, will result in unacceptable levels of pollution. At that point the only remedy will be enforcement cases against the individual sanitary districts in the county, in which the cease and desist orders favored by Lombard, as well as more drastic devices such as sewer bans, could be used. Such proceedings are, at best, an extremely unsatisfactory way of dealing with complex environmental problems, and can sometimes work hardship on a large number of people. (See, e.g., *League of Women Voters v. North Shore Sanitary Dist.*, PCB Nos. 70-7, 70-12, 70-13, 70-14 (March 31, 1971), 2 ERC 1442, the Lake County sewer ban case.) If the Board is deprived of its power to rationally regulate to prevent that kind of situation, one can only expect more piecemeal enforcement cases which impose hardships on third parties and which come only after significant environmental damage has occurred. Regionalization will allow orderly growth in Du Page County without the need for a sewer ban.

As a necessary concomitant to its authority to regulate to prevent water

450

pollution, the Board has the authority to issue the kind of order at issue here. This court should uphold it in its entirety. *Cf. Metropolitan Sanitary Dist. v. City of Des Plaines,* 63 Ill. 2d 265.

I would affirm.